# EXHIBIT 1

STATE OF NORTH CAROLINA

FORSYTH COUNTY

FILED

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 20 CVS 352

2020 JAN 17 P 2:58

FORSYTH CO., C.S.C.
BY

SUSAN K. STEVENS, Administratrix of The ESTATE OF TORIA CAPRI STEVENS

Plaintiff,

v.

AMERISOURCEBERGEN DRUG CORPORATION;
ABBOTT LABORATORIES, INC.;
ACTAVIS LLC;
ACTAVIS PHARMA, INC.;
ALLERGAN PLC;
AMNEAL PHARMACEUTICALS, LLC;
CARDINAL HEALTH, INC.;
CEPHALON, INC.;
CVS HEALTH CORPORATION;
CVS HEALTH SOLUTIONS, LLC;
CVS PHARMACY, INC.;
ECKERD CORPORATION d/b/a RITE AID PHARMACY;
ENDO HEALTH SOLUTIONS INC.;
ENDO PHARMACEUTICALS INC.;
JANSSEN PHARMACEUTICA INC.;
JANSSEN PHARMACEUTICALS, INC.;
J.M. SMITH CORPORATION;
JOHNSON & JOHNSON;
KVK-TECH, INC.;
MALLINCKRODT, LLC;
MALLINCKRODT, PLC;
McKESSON CORPORATION;
NORAMCO, INC.;
ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.;
PAR PHARMACEUTICAL, INC.;
PAR PHARMACEUTICAL COMPANIES, INC.;
RITE AID OF NORTH CAROLINA, INC.;
RITE AID CORPORATION;

**COMPLAINT**

Plaintiff's First Set of Interrogatories, Request for Production of Documents, and Request for Admissions included

SPECGX, LLC; )
TEVA PHARMACEUTICAL INDUSTRIES LTD; )
TEVA PHARMACEUTICALS USA, INC.; )
THE NORTH CAROLINA MUTUAL )
WHOLESALE DRUG COMPANY; )
WALGREENS BOOTS ALLIANCE, INC.; )
WALMART INC., f/k/a WAL-MART STORES, )
INC.; )
WATSON LABORATORIES, INC.; )
WATSON PHARMACEUTICALS, INC.; )
BEVERLY SACKLER; )
DAVID SACKLER; )
ILENE SACKLER LEFCOURT; )
JONATHAN SACKLER; )
KATHE SACKLER; )
MORTIMER D.A. SACKLER; )
RICHARD SACKLER; )
THERESA SACKLER, )
)
Defendants. )

COMES NOW Plaintiff, by and through undersigned counsel, complaining of Defendants, and alleges and says as follows:

**SUMMARY**

This suit alleges, in part, two primary causes of the opioid crisis: (a) a marketing scheme involving the false and deceptive marketing of prescription opioids, which was designed to dramatically increase the demand for and sale of opioids and opioid prescriptions; and (b) a supply chain scheme, pursuant to which the various entities in the supply chain failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified, thereby contributing to the oversupply of such drugs and fueling an illegal secondary market. Additionally, some or all of the defendants committed wrongful acts in the chain of supply, manufacture, sale, marketing or distribution of opioids in North Carolina.

## ALLEGATIONS

1. Plaintiff, Susan K. Stevens, is the duly appointed Administratrix of the Estate of Toria Capri Stevens, in Forsyth County, North Carolina, having been duly appointed on January 13, 2020.

2. Toria Capri Stevens (hereafter referred to as "Toria") was born on November 24, 1995 and died on January 22, 2018.

3. A copy of the certificate of death of Toria is attached hereto as Exhibit "A." The injury resulting in her death and the immediate cause of her death was Fentanyl and Clonazepam toxicity.

4. Prior to her death, Toria had been a very active student in high school and technical school. At age 16 Toria was prescribed opioids for wisdom teeth extraction from which she developed dependency and addiction to opioids. As a result of her opioid addiction, Toria suffered with anxiety and used opioids in response to stressors in her life. She was unable to simply will herself to successfully discontinue opioid medication due to the unabated addiction to opioids.

5. Upon information and belief, one or more of the Defendants manufactured, and or distributed opioids in Forsyth County, North Carolina prescribed to Toria. The Manufacturer Defendants are defined below. At all relevant times, the Manufacturer Defendants have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs.

6. CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an

Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, TEVA LTD acquired CEPHALON, INC. TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a Delaware corporation registered to do business in North Carolina and is a wholly-owned subsidiary of TEVA LTD in Pennsylvania. TEVA USA acquired CEPHALON in October 2011.

7. CEPHALON, INC. manufactures, promotes, sells and distributes opioids, such as Actiq and Fentora, in the United States. Actiq has been approved by the FDA only for the "management of breakthrough cancer pain in patients sixteen years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain." Fentora has been approved by the FDA only for the "management of breakthrough pain in cancer patients eighteen years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."

8. TEVA LTD, TEVA USA and CEPHALON, INC. work together closely to market and sell CEPHALON products in the United States. TEVA LTD conducts all sales and marketing activities for CEPHALON in the United States through TEVA USA and has done so since its October 2011 acquisition of CEPHALON. TEVA LTD and TEVA USA hold out Actiq and Fentora as TEVA products to the public. TEVA USA sells all former CEPHALON branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide, which is distributed with CEPHALON opioids, discloses that TEVA USA submitted the guide, and directs physicians to contact TEVA USA to report adverse events.

9. All of CEPHALON's promotional websites, including those for Actiq and Fentora, display Teva Ldt's logo. Teva Ltd's financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012 – the year immediately following the

CEPHALON acquisition – attributed a twenty-two percent increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales," including, inter alia, sales of Fentora®. Through interrelated operations like these, TEVA LTD operates in the United States through its subsidiaries CEPHALON and TEVA USA. The United States is the largest of TEVA LTD's global markets, representing fifty-three percent of its global revenue in 2015, and, were it not for the existence of TEVA USA and CEPHALON, INC., TEVA LTD would conduct those companies' business in the United States itself. Upon information and belief, TEVA LTD directs the business practices of CEPHALON and TEVA USA, and their profits inure to the benefit of TEVA LTD as controlling shareholder. TEVA PHARMACEUTICAL INDUSTRIES, LTD, TEVA PHARMACEUTICAL USA, INC. and CEPHALON, INC. are referred to as "Cephalon."

10. JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey and is a wholly owned subsidiary of JOHNSON & JOHNSON (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. NORAMCO, INC. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J until July 2016. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation registered to do business in North Carolina with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than ten percent of Janssen Pharmaceuticals' stock, and J&J corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure

to J&J's benefit. JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC.; Noramco and J&J are referred to as "Janssen."

11. Janssen manufactures, promotes, sells and distributes drugs in the United States, including the opioid Duragesic (fentanyl).

12. Defendant, KVK-TECH, INC. is a privately held Pennsylvania corporation with its principal place of business in Pennsylvania. KVK-TECH, INC. is a manufacturer of generic prescription opioids, including many Schedule II controlled substances such as Oxycodone and Hydrocodone. KVK-TECH, INC. manufactures, markets, sells and/or distributes pharmaceutical drugs nationally and in Plaintiff's Community. KVK-TECH, INC. is registered to conduct business and/or conducts business in Plaintiff's community as a licensed wholesale pharmaceutical distributor. KVK-TECH, INC. distributed opioids, in violation of the duties owed to Plaintiff as set forth herein, in sufficient quantities to be a proximate cause of Plaintiff's injuries KVK-TECH, INC.

13. ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS INC. is a wholly- owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation registered to do business in North Carolina with its principal place of business in Malvern, Pennsylvania. Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are referred to as "Endo."

14. Endo develops, markets and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet and Zydone, in the United States. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone and hydrocodone products in the United States, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

15. ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired ALLERGAN PLC in March 2015, and the combined company changed its name to ALLERGAN PLC in January 2013. Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012, and the combined company changed its name to ACTAVIS, INC. as of January 2013 and then ACTAVIS PLC in October 2013. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of ALLERGAN PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is registered to do business with the North Carolina Secretary of State as a Delaware corporation with its principal place of business in New Jersey and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by ALLERGAN PLC, which uses them to market and sell its drugs in the United States. Upon information and belief, ALLERGAN PLC exercises control over these marketing and sales efforts, and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. ALLERGAN PLC; ACTAVIS PLC; ACTAVIS, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC.; WATSON PHARMACEUTICALS, INC.; WATSON PHARMA, INC. and WATSON LABORATORIES, INC. are referred to as "Actavis."

16. Actavis manufactures, promotes, sells and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian and generic versions of Duragesic and Opana, in the United States. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008 and began marketing Kadian in 2009.

17. MALLINCKRODT, PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri. MALLINCKRODT, LLC is a limited liability company organized and existing under the laws of the State of Delaware and licensed to do business in North Carolina. MALLINCKRODT, LLC is a wholly owned subsidiary of MALLINCKRODT, PLC. MALLINCKRODT, PLC and MALLINCKRODT, LLC are referred to as "Mallinckrodt."

18. Mallinckrodt manufactures, markets and sells drugs in the United States, including generic oxycodone, of which it is one of the largest manufacturers. In July 2017, Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the DEA of suspicious orders of controlled substances.

19. Upon information and belief, ABBOTT LABORATORIES, INC. is an Illinois corporation authorized to do business and doing business throughout North Carolina. ABBOTT LABORATORIES, INC. engages in the manufacture, sale, and distribution of opioids.

20. The Distributor Defendants also are defined below. At all relevant times, the Distributor Defendants have distributed, supplied, sold and placed into the stream of commerce the prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes. The Distributor Defendants universally failed to comply with federal and/or state law. The Distributor Defendants are engaged in "wholesale distribution," as defined under state and federal law. Plaintiff alleges the unlawful conduct by the Distributor Defendants is responsible for the volume of prescription opioids plaguing Toria's Community.

21. Upon information and belief, Defendant ECKERD CORPORATION d/b/a RITE AID PHARMACY is a foreign corporation authorized to do business and doing business

throughout North Carolina. ECKERD CORPORATION engages in the sale and distribution of opioids.

22. Defendant, J.M. SMITH CORPORATION ("J.M. Smith") is a South Carolina corporation with its principal place of business in Spartanburg, South Carolina. At all times relevant to this Complaint, J.M. SMITH distributed prescription opioids throughout the eastern United States in at least thirty-two states, including in Plaintiff's Community. J.M. SMITH conducts business as a licensed wholesale distributor under the name Smith Drug Company which is a division of J.M. SMITH.

23. J.M. SMITH is registered to conduct business and/or conducts business in Plaintiff's community as a licensed wholesale pharmaceutical distributor. J.M. SMITH distributed opioids, in violation of the duties owed to Plaintiff as set forth herein, in sufficient quantities to be a proximate cause of Plaintiff's injuries. J.M. SMITH is sued as a Distributor Defendant.

24. Defendant, RITE AID CORPORATION ("Rite Aid") is a Delaware corporation with its principal office located in Camp Hill, Pennsylvania. RITE AID CORPORATION, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor.

25. Defendant RITE AID is registered to conduct business and/or conducts business in Plaintiff's community as a licensed wholesale pharmaceutical distributor under the following named business entities: Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc., Rite Aid of Massachusetts, Rite Aid of Michigan, and Rite Aid of West Virginia, Inc. Rite Aid distributed opioids, in violation of the duties owed to Plaintiff as set

herein, in sufficient quantities to be a proximate cause of Plaintiff's injuries. Rite Aid is sued as a Distributor Defendant.

26. Upon information and belief, Defendant RITE AID OF NORTH CAROLINA, INC. is a North Carolina corporation with its principal place of business in Pennsylvania, doing business throughout North Carolina. RITE AID OF NORTH CAROLINA, INC. engages in the sale and distribution of opioids. Hereinafter, this defendant and ECKERD CORPORATION are collectively referred to as "Rite Aid."

27. Defendant, McKESSON CORPORATION, is registered with the North Carolina Secretary of State as a Delaware corporation. McKesson has its principal place of business located in San Francisco, California.

28. Defendant, CARDINAL HEALTH, INC., is an Ohio corporation with its principal office located in Dublin. CARDINAL HEALTH, INC. operates a distribution center in Greensboro, North Carolina.

29. Defendant, AMERISOURCEBERGEN DRUG CORPORATION, is registered with the North Carolina Secretary of State as a Delaware corporation. Amerisourcebergen Drug Corporation's principal place of business is located in Chesterbrook, Pennsylvania.

30. Plaintiff has named the three (3) wholesale distributors (i.e., AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC. and McKESSON CORPORATION) that dominate eighty-five percent of the market share for the distribution of prescription opioids. The "Big 3" are Fortune 500 corporations listed on the New York Stock Exchange whose principal business is the nationwide wholesale distribution of prescription drugs. Plaintiff believes and alleges that each of these companies has engaged in conduct that resulted in the diversion of prescription opioids into our community and that

discovery will likely reveal others who likewise engaged in conduct, contrary to statutory regulations and common law duties.

31. Upon information and belief, Defendant THE NORTH CAROLINA MUTUAL WHOLESALE DRUG COMPANY is a North Carolina corporation, also formed as North Carolina Mutual Association, doing business throughout North Carolina, including Forsyth County, and is engaged in the distribution of opioids.

32. Upon information and belief, Defendant SPECGX, LLC is a Delaware limited liability company doing business throughout North Carolina, including Forsyth County, and is engaged in the distribution of opioids. Upon information and belief, Defendant SPECGX, LLC is a wholly owned subsidiary of Defendant MALLINCKRODT, PLC.

33. Upon information and belief, Defendant PAR PHARMACEUTICAL, INC. is a New York corporation doing business throughout North Carolina, including Forsyth County, and is engaged in the distribution of opioids. Upon information and belief, this Defendant is a wholly owned subsidiary of Defendant ENDO.

34. Upon information and belief, Defendant PAR PHARMACEUTICAL COMPANIES, INC. is a New York corporation doing business throughout North Carolina, including Forsyth County, and is engaged in the distribution of opioids. Upon information and belief, this Defendant is a wholly owned subsidiary of Defendant ENDO. Hereinafter, these all PAR defendants are collectively referred to as "Par Pharma."

35. Upon information and belief, Defendant AMNEAL PHARMACEUTICALS, LLC is a Delaware limited liability company doing business throughout North Carolina, including Forsyth County, and is engaged in the distribution of opioids.

36. Upon information and belief, Defendant CVS PHARMACY, INC. is a Rhode Island corporation doing business throughout North Carolina, including Forsyth County, and is engaged in the distribution of opioids.

37. Upon information and belief, Defendant CVS HEALTH SOLUTIONS LLC is a Delaware limited liability company doing business throughout North Carolina, including Forsyth County, and is engaged in the distribution of opioids. Upon information and belief, Defendant CVS PHARMACY, INC. is the manager of Defendant CVS HEALTH SOLUTIONS LLC.

38. Upon information and belief, Defendant CVS HEALTH CORPORATION is a Delaware corporation doing business throughout North Carolina, including Forsyth County, and is engaged in the distribution of opioids. Hereinafter, all CVS defendants are collectively referred to as "CVS."

39. Upon information and belief, Defendant WALMART INC. f/k/a WAL-MART STORES, INC. is a Delaware corporation doing business throughout North Carolina, including Forsyth County, and is engaged in the distribution of opioids.

40. Upon information and belief, Defendant WALGREENS BOOTS ALLIANCE, INC. is an Illinois corporation doing business throughout North Carolina, including Forsyth County, and is engaged in the distribution of opioids.

41. Upon information and belief, several of the named Defendants are partially- or wholly-owned subsidiaries of other named Defendants. These intertwined Defendants have used these complex relationships to violate statutory regulations, common-law duties, and other like standards of care with impunity. To the extent Plaintiff has not alleged such relationships, and to the extent they exist, Plaintiff alleges such, upon information and belief.

42. Upon information and belief, the following Defendants, all members of the Sackler family which owns PURDUE PHARMA L.P. and other Purdue entities, and hereinafter collectively referred to as "Sackler Defendants," served on the board of Purdue and greatly benefitted financially from the manufacture, sale, and distribution of opioids throughout North Carolina, including Forsyth County:

a. Richard Sackler, a competent adult citizen and resident of Florida;

b. Beverly Sackler, a competent adult citizen and resident of Connecticut;

c. David Sackler, a competent adult citizen and resident of New York;

d. Ilene Sackler Lefcourt, a competent adult citizen and resident of New York;

e. Jonathan Sackler, a competent adult citizen and resident of Connecticut;

f. Kathe Sackler, a competent adult citizen and resident of Connecticut;

g. Mortimer D.A. Sackler, a competent adult citizen and resident of New York; and

h. Theresa Sackler, a competent adult citizen and resident of the United Kingdom.

43. This Court has personal jurisdiction over Defendants because they conduct business in North Carolina, purposefully direct or directed their actions toward North Carolina, consented to be sued in North Carolina by registering an agent for service of process, and/or consensually submitted to the jurisdiction of North Carolina when obtaining a manufacturer or distributor license and have the requisite minimum contacts with North Carolina necessary to constitutionally permit the Court to exercise jurisdiction.

44. This Court has jurisdiction over the parties to this action and the subject matter of this action, and venue is proper in this Court.

45. Toria developed an addiction to opioids for treatment of pain, and for which her family helped her seek rehabilitation; however, Toria's efforts at rehabilitation failed.

46. At age 21 Toria was prescribed opioids again for a leg injury and her sobriety from rehabilitation ended as she relapsed into addiction.

47. After Toria turned twenty-one years of age and took the prescribed opioids again, she could not manage orthopedic and chronic pain without taking opioids.

48. Toria continued to use opioids which resulted in her death.

49. The Defendants' conduct in misrepresenting the non-addictive nature of the prescription opioids, in selling the opioids for chronic pain treatment, and the distributors conduct in supplying opioids yet failing to abide by federal regulations to report suspicious orders and stop shipments of suspicious orders, allowed a flood of opioids into Forsyth County, and the surrounding areas. Furthermore, the extended use of opioids for pain as marketed and described in the advertising and distribution of the Defendants was improper.

## FIRST CAUSE OF ACTION
**Negligence, Negligent Misrepresentation, and Wrongful Death**
**(Against All Defendants)**

50. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

51. Plaintiff seeks economic damages which were the foreseeable result of Defendants' negligent, grossly negligent, intentional and/or willful or wanton actions and omissions.

52. Each Defendant had an obligation to exercise reasonable care in manufacturing, marketing, selling, distributing and supplying highly dangerous opioid drugs to the State and Toria's Community.

53. Each Defendant had an obligation to exercise due care in manufacturing, marketing, selling, distributing and supplying highly dangerous opioid drugs in the State and Toria's Community.

54. Each Defendant owed a duty to the Toria and to Toria's Community because the injuries alleged herein were foreseeable, and in fact foreseen, by the Defendants.

55. Reasonably prudent manufacturers of pharmaceutical products would know that aggressively pushing highly addictive opioids for chronic pain would result in the severe harm of addiction, foreseeably causing patients to seek increasing levels of opioids, frequently turning to the illegal drug market as a result of a drug addiction that was foreseeable to the Manufacturer Defendants.

56. Defendants were repeatedly warned by law enforcement of the consequences of their actions and omissions and that their misconduct was contrary to statutory regulations and common law duties.

57. The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

58. Distributor Defendants breached their duties to exercise due care in the business of wholesale distribution and supply of dangerous opioids, which are highly regulated substances under Federal and State laws, by failing to monitor for, failing to report, and filling highly

suspicious orders time and again. Because the very purpose of these duties was to prevent the resulting harm – diversion of highly addictive drugs for non- medical purposes – the causal connection between Defendants' breach of duties and the ensuing harm was entirely foreseeable.

59. Distributor Defendants misrepresented their compliance with their duties under the law and concealed their noncompliance and shipments of suspicious orders of opioids to Toria's community and destinations from which they knew opioids were likely to be diverted into Toria's community, in addition to other misrepresentations alleged and incorporated herein.

60. Manufacturer Defendants breached their duties to exercise due care in the business of pharmaceutical manufacturers of dangerous opioids and by misrepresenting the nature of the drugs and aggressively promoting them for chronic pain for which they knew the drugs were not safe or suitable.

61. Manufacturer Defendants misrepresented and concealed the addictive nature of prescription opioids and its lack of suitability for chronic pain, in addition to other misrepresentations alleged and incorporated herein.

62. Defendants breached their duties to prevent diversion and report and halt suspicious orders, and all Defendants misrepresented their compliance with their legal duties.

63. Defendants' breaches were intentional and/or willful, and Defendants' conduct was willful, wanton, malicious, reckless, oppressive, and/or fraudulent, and contrary to statutory regulations and common law duties.

64. The causal connection between Defendants' breaches of duties and misrepresentations and the ensuing harm was entirely foreseeable.

65. Defendants knew or should have known:

a. Their wrongful misconduct would and did lead people like Toria to become addicted to opioids;

b. Opioid addiction would lead opioid addicts to misuse other substances; and

c. This pattern would lead some of those people, including Toria, to die of overdoses of street drugs.

66. Defendants' breaches of duty and misrepresentations bear a causal connection with, and/or proximately resulted in the damages sought herein.

67. Defendants intended for Toria to rely on information regarding their products; the information was false; the Defendants failed to use reasonable care or competence in obtaining or communicating the information; Toria relied on such information and had no other or actual means to determine its falsity, was denied the opportunity to investigate, could not have learned of the true facts by the exercise of reasonable diligence; and such reliance caused financial damage to Toria and her heirs at law and will continue to do so in the future.

68. Defendants were selling dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Defendants knowingly traded in drugs and supplied drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than medical, scientific, or industrial channels. However, Defendants breached their duties to monitor for, report, and halt suspicious orders, breached their duties to stop the wrongful supply and prevent diversion, and, further, misrepresented what their duties were and their compliance with their legal duties.

69. Defendants' willful, wanton, and/or intentional actions constitute negligence and gross, willful, or wanton negligence and were entirely contrary to statutory regulations and common-law duties.

70. As a direct and proximate result of Defendants' conduct, as described herein, Toria sustained injuries that directly and proximately caused her significant, severe, and painful personal injury and caused Toria to incur medical expenses.

71. Defendant's negligence directly and proximately caused damages to Toria, and Plaintiff is entitled to recover an amount in excess of $25,000.00.

72. As a direct and proximate result of Defendants' conduct, as described herein, Toria sustained injuries that directly and proximately caused her death. Accordingly, Plaintiff, as the Administratrix of the Estate of Toria, Susan K. Stevens, is entitled to recover damages of Defendants, pursuant to North Carolina General Statute § 28A-18-2, including, but not limited to, the following:

a. Medical expenses related to the injuries and the care and treatment incident to those injuries prior to Toria's death and resulting in the wrongful death of Toria;

b. Compensation for the pain and suffering of Toria from the moment of her addiction to the time of her death;

c. The reasonable expenses for the funeral of Toria;

d. The present monetary value of Toria to the persons entitled to receive the damages recovered, including lost net income as well as damages for the services, protection, care, assistance, society, companionship, comfort, guidance, kindly offices, and advice of Toria; and

e. All other damages permitted by law.

73. Plaintiff, in her capacity as the Administratrix of Decedent's Estate, hereby brings this action for wrongful death against Defendant, to recover all damages permitted by law, in an amount in excess of $25,000.00.

**SECOND CAUSE OF ACTION**
**Negligence**
**(Against All Defendants)**

74. Plaintiff repeats and restates the previous paragraphs of the Complaint as if set forth again herein.

75. In the alternative to the Wrongful Death claim, Plaintiff, in her capacity as the Administratrix of Decedent's Estate, is entitled to pursue a personal injury claim on behalf of the Estate against Defendants for the above-described negligence, pursuant to North Carolina General Statute § 28A-13-3(a)(15).

76. As a direct and proximate result of Defendants' above-described negligence, Toria sustained injuries that directly and proximately caused her significant, severe, and painful personal injury, and those injuries resulted in Toria's addiction to opioids and her suffering of all the negative effects associated therewith.

77. As a direct and proximate result of Defendants' above-described negligence, Toria incurred medical expenses, became addicted to opioids, and experienced pain and suffering.

78. Plaintiff, in her capacity as the Administratrix of Decedent's Estate, hereby brings this survival action for negligence against Defendants, to recover all damages for Toria's personal injuries suffered as a result of Defendants' conduct, both pre-death and in causing her death, in an amount in excess of $25,000.00.

## THIRD CAUSE OF ACTION
**Negligence per se**
**(Against All Defendants)**

79. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

80. The North Carolina controlled substances laws and regulations are public safety laws. Each Defendant had a duty under, inter alia, these laws maintain effective controls against diversion of prescription opioids and to guard against, prevent, and report suspicious orders of opioids. Toria and Toria's Community are within the class of persons intended to be protected by these laws.

81. Defendants' actions and omissions in violation of law and regulation constitute negligence per se.

82. Defendants' actions and omissions were intentional, and Defendants acted with actual malice and constituted gross, willful, or wanton conduct and contrary to statutory regulations and common law duties.

83. It was foreseeable that the breach of duty described herein would result in the damages for which Plaintiff seeks recovery, including damages for Toria's wrongful death and for Toria's bodily injury, and associated damages, pre-death. To the extent necessary, the claim for pre-death damages may be considered a survival action or survival claim.

84. Defendants breached their duties to maintain effective controls against diversion and wrongful supply of dangerously addictive opioids, including violating public safety statutes requiring such controls as wholesale drug distributors.

85. Defendants' breach of statutory and regulatory duties caused, bear a causal connection with, and proximately resulted in, harm and damages sought by the Plaintiff.

86. Defendant's negligence directly and proximately caused damages to Toria, and Plaintiff is entitled to recover an amount in excess of $25,000.00.

**FOURTH CAUSE OF ACTION**
**Violations of North Carolina's Unfair and Deceptive Trade Practices Act**
**(Against All Defendants)**

87. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

88. Defendants violated N.C. Gen. Stat. 75-1 et seq., because they engaged in deceptive trade practices in this State.

89. Defendants committed and are committing repeated and willful unfair or deceptive acts or practices, and unconscionable trade practices, in the conduct of, and in or affecting, commerce.

90. Each Defendant failed to report suspicious orders of and/or prevent the diversion and wrongful supply of highly addictive prescription drugs to illegal sources.

91. Because of the dangerously addictive nature of these drugs, the Defendants' manufacturing, marketing, sales, supply chain and/or distribution practices caused an opioid epidemic in the State and Toria's community. Each Defendant had a non-delegable duty to guard against and prevent the diversion of prescription opioids to other than legitimate medical, scientific, and industrial channels.

92. Defendants also omitted material facts, causing confusion or misunderstanding as to approval or certification of goods or services.

93. Defendants failed to disclose the material facts that, inter alia, they were not in compliance with laws and regulations requiring that they maintain a system to prevent diversion, protect against addiction and severe harm, and specifically monitor, investigate, report, and

refuse suspicious orders. But for these material factual omissions, Defendants would not have been able to supply and sell opioids, and the Distributor Defendants would not have been able to receive and renew licenses to supply and sell opioids. As alleged herein, each Manufacturer Defendant wrongfully represented that the opioid prescription medications they manufactured, marketed, and sold had characteristics, uses, or benefits that they do not have.

94. Manufacturer Defendants wrongfully marketed and misrepresented that the opioids were safe and effective when such representations were untrue, false, and misleading.

95. Manufacturer Defendants engaged in wrongful, misleading marketing and an improper rebate scheme to unfairly target specific markets and increase sales volume.

96. Manufacturer Defendants used exaggeration and/or ambiguity as to material facts and omitted material facts, which tended to deceive and/or did in fact deceive in the course of wrongful and misleading marketing.

97. Because of the dangerously addictive nature of these drugs, which the Manufacturer Defendants concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths; therefore, Defendants' sales and marketing of opioids constituted a violation of State law.

98. Manufacturer Defendants made deceptive representations about the use of opioids to treat chronic non-cancer pain. Each Manufacturer Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids in the course of misleading and wrongful marketing. Each Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

99. Defendants' unfair, deceptive, and unconscionable representations, concealments, and omissions were reasonably calculated to deceive the State, the public, Toria's community, and Toria.

100. As described more specifically above, Defendants' representations, concealments, and omissions constitute a willful course of conduct which continues to this day.

101. The damages which Plaintiff seeks to recover were sustained as a direct and proximate cause of the Manufacturer and Distributor Defendants' intentional and/or willful or wanton actions and omissions, which were contrary to statutory regulations and common law duties.

102. Defendants' actions and omissions in the course of marketing, selling, supplying and distributing prescriptions opioids constituted deceptive trade practices under applicable law.

103. It is unlawful to represent that goods or services have sponsorship, approval, characteristics, uses, or benefits that they do not have. It is improper to represent that goods are of a standard, quality, or grade if they are of another. Defendants made such deceptive and unlawful misrepresentations.

104. Defendants have engaged in repeated and willful unfair or deceptive acts or practices, and unconscionable trade practices, in the conduct of commerce in this State and in Toria's community.

105. Each Defendant failed to report and/or prevent the diversion of highly addictive prescription drugs.

106. Manufacturer Defendants also wrongfully misrepresented that the opioids were safe and effective for ordinary pain management when such representations were untrue, false,

and misleading, all of which was an integral part of Defendants wrongful, improper and misleading marketing.

107. Because of the dangerously addictive nature of these drugs, which the Manufacturer Defendants concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths; therefore, Defendants' sales and marketing of opioids constituted a violation of State and Federal law.

108. Manufacturer Defendants made deceptive representations about the use of opioids to treat chronic non-cancer pain. Each Manufacturer Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. Each Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

109. Defendants acted intentionally and were contrary to statutory regulations and common law duties.

110. Defendants' actions directly and proximately caused injury to Toria, as alleged herein, including damages for Toria's wrongful death and for Toria's bodily injury, and associated damages, pre-death. To the extent necessary, the claim for pre-death damages may be considered a survival action or survival claim.

111. Defendants' actions affected commerce and constituted commercial activity.

112. Defendants' violations of Federal law, regulations, and statutes constitute per se violations of N.C. Gen. Stat. § 75-1, et seq.

113. Plaintiff seeks all damages pursuant to N.C. Gen. Stat. § 75-1, et seq., trebled, and attorney's fees, for injuries sustained because of Defendants' violation of statutory and common law, and all legal and equitable relief as allowed by law.

**FIFTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(Manufacturing Defendants)**

114. Plaintiff incorporates each of the previous paragraphs as if fully restated and realleged herein.

115. Upon information and belief, Defendants expressly warranted to Toria and Toria's physicians and pharmacists that the opioids were indicated for use as marketed and prescribed, they were safe and effective for their stated purposes, and that addiction, complications, or problems with the opioids were very rare.

116. Toria was a user and consumer of Defendants' products, and Toria and Toria's physicians initially used Defendants' products in the way Defendants intended they be used.

117. Defendants breached their express warranty by failing to provide opioids that were safe, effective, and properly designed and manufactured for their stated purpose.

118. Defendants breached their express warranty by designing, manufacturing, marketing, and selling opioids in such a way that, when used as advertised, marketed, and prescribed, caused addiction and death.

119. Defendants' breaches were the direct and proximate cause of the damages suffered by Toria, including damages for Toria's wrongful death and for Toria's bodily injury, and associated damages, pre-death. To the extent necessary, the claim for pre-death damages may be considered a survival action or survival claim.

120. As a result of Defendants' breaches, Plaintiff is entitled to recover an amount in excess of $25,000.00.

**SIXTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Fitness for a Particular Purpose**
**(All Defendants)**

121. Plaintiff incorporates each of the previous paragraphs as if fully restated and realleged herein.

122. Defendants knew that the opioids would be provided to patients for pain management and other purposes and that physicians and patients were relying on Defendants' judgment to furnish suitable goods.

123. Defendants knew or should have known that the opioids did not meet the capabilities as Defendants represented and marketed them, were more addictive than Defendants represented and marketed them, and were less effective than Defendants represented and marketed them.

124. Toria initially used the opioids for the particular purpose and in the manner intended by Defendants, eventually resulting in her addiction and death by overdose.

125. Toria and Toria's physicians, by the use of reasonable care, would not have discovered the breached warranty and realized the danger of the breach.

126. Defendants' breaches of the implied warranty were a direct and proximate cause in bringing about Toria's injuries and death, including damages for Toria's wrongful death and for Toria's bodily injury, and associated damages, pre-death. To the extent necessary, the claim for pre-death damages may be considered a survival action or survival claim.

127. As a direct and proximate result of Defendants' actions, Toria suffered injury and death and Defendants are liable to Plaintiff in an amount in excess of $25,000.00.

**SEVENTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**(All Defendants)**

128. Plaintiff incorporates each of the previous paragraphs as if fully restated and realleged herein.

129. Defendants, as the manufacturers, marketers, and sellers of the opioids, are merchants with respect to their own products.

130. By manufacturing, marketing, and selling the opioids, Defendants warranted that the opioids would be merchantable, in that they would be fit for the ordinary purposes for which such products are used; namely, for effective and non-addictive pain management.

131. Toria was a user and consumer of Defendants' opioids, and Toria and Toria's physicians initially used Defendants' products in the way Defendants intended they be used, resulting in Toria's addiction and death.

132. As the purchaser of the opioids, Toria reasonably relied upon Defendants' implied warranties.

133. Defendants breached their implied warranties by designing, marketing, manufacturing, and selling the opioids in such a way that they caused addiction and treated pain less effectively than advertised, without Toria and other users' awareness of these risks.

134. Defendants' breaches were the direct and proximate cause of the damages suffered by Toria, including damages for Toria's wrongful death and for Toria's bodily injury, and associated damages, pre-death. To the extent necessary, the claim for pre-death damages may be considered a survival action or survival claim.

135. As a result of Defendants' breaches, Plaintiff is entitled to recover an amount in excess of $25,000.00.

**EIGHTH CAUSE OF ACTION**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. 1961, et seq.**
**(Against Defendants named herein)**

136. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

137. Plaintiff brings this Count on behalf of itself against the following Defendants, as defined above: Cephalon, Janssen, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, the Sackler Defendants, and AmerisourceBergen (collectively, for purposes of this Count, the "RICO Defendants").

138. The RICO Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal entity enterprise. At all relevant times, the RICO Defendants were "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

139. Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

140. The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The definition of "enterprise" in 18 U.S.C. § 1961(4) includes legitimate and illegitimate enterprises within its scope.

141. For over a decade, the RICO Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, the RICO Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers. As "registrants," the RICO Defendants operated and continue to operate

within the "closed-system" created under the Controlled Substances Act, 21 U.S.C. § 821, et seq. (the "CSA"). The CSA restricts the RICO Defendants' ability to manufacture or distribute Schedule II substances like opioids by requiring them to: (1) register to manufacture or distribute opioids; (2) maintain effective controls against diversion of the controlled substances that they manufacturer or distribute; (3) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA; and (4) make sales within a limited quota set by the DEA for the overall production of Schedule II substances like opioids.

142. The closed-system created by the CSA, including the establishment of quotas, was specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids from "legitimate channels of trade" to the illicit market by controlling the quantities of the basic ingredients needed for the manufacture of [controlled substances]."

143. Finding it impossible to legally achieve their ever increasing sales ambitions, members of the Opioid Diversion Enterprise (as defined below) systematically and fraudulently violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders. As discussed in detail below, through the RICO Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of painkillers which, in turn, artificially and illegally increased the annual production quotas for opioids allowed by the DEA. In doing so, the RICO Defendants allowed hundreds of millions of pills to enter the illicit market which allowed them to generate obscene profits.

144. Defendants' illegal scheme was hatched by an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants and executed in perfect harmony by each of them. In particular, each of the RICO Defendants were associated with, and conducted or participated in, the affairs of the RICO enterprise (defined below and referred to collectively as the "Opioid Diversion Enterprise"), whose purpose was to engage in the unlawful sales of opioids, deceiving the public and federal and state regulators into believing that the RICO Defendants were faithfully fulfilling their statutory obligations. The RICO Defendants' scheme allowed them to make billions in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market share. As a direct result of the RICO Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, they were able to extract billions of dollars of revenue from the addicted American public, while people like Toria and communities like Toria 's experienced tens of millions of dollars of injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic. The RICO Defendants' misconduct violated Section 1962(c) and Plaintiff is entitled to treble damages for its injuries under 18 U.S.C. § 1964(c).

145. Alternatively, the RICO Defendants were members of a legal entity enterprise within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States. Specifically, the Healthcare Distribution Alliance (the "HDA") is a distinct legal entity that satisfies the definition of a RICO enterprise. The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia. As a non-profit corporation, HDA qualifies as an "enterprise" within the definition set out in 18 U.S.C. § 1961(4).

146. On information and belief, each of the RICO Defendants is a member, participant, and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion Enterprise and to engage in the pattern of racketeering activity that gives rise to the Count.

147. Each of the RICO Defendants is a legal entity separate and distinct from the HDA. Moreover, the HDA serves the interests of distributors and manufacturers beyond the RICO Defendants. Therefore, the HDA exists separately from the Opioid Diversion Enterprise, and each of the RICO Defendants exists separately from the HDA. Therefore, the HDA may serve as a RICO enterprise.

148. The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the RICO Defendants to conduct the Opioid Diversion Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

## A. THE OPIOID DIVERSION ENTERPRISE

149. Recognizing that there was a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970. The CSA and its implementing regulations created a closed system of distribution for all controlled substances and listed chemicals. Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market. Congress was concerned with the diversion of drugs out of legitimate channels of distribution when it enacted the CSA and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market." Moreover, the closed system was specifically designed to

ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain. All registrants -- manufacturers and distributors alike -- must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion. When registrants at any level fail to fulfill their obligations, the necessary checks and balances collapse. The result is the scourge of addiction that has occurred.

150. In 2006 and 2007, the DEA issued multiple letters to the Distributor Defendants reminding them of their obligation to maintain effective controls against diversion of particular controlled substances, design and operate a system to disclose suspicious orders, and to inform the DEA of any suspicious orders. The DEA also published suggested questions that a distributor should ask prior to shipping controlled substances, in order to "know their customers."

151. Central to the closed system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year. The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs." When evaluating production quotas, the DEA was instructed to consider the following information:

a. Information provided by the Department of Health and Human Services;

b. Total net disposal of the basic class by all manufacturers;

c. Trends in the national rate of disposal of the basic class;

d. An applicant's production cycle and current inventory position;

e. Total actual or estimated inventories of the class and of all substances manufactured from the class and trends in inventory accumulation; and

f. Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.

152. It is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.

153. At all relevant times, the RICO Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by disregarding their statutory duty to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market, in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States through this enterprise.

154. The opioid epidemic has its origins in the mid-1990s when, between 1997 and 2007, per capita purchase of methadone, hydrocodone, and oxycodone increased thirteen-fold, four-fold, and nine-fold, respectively. By 2010, enough prescription opioids were sold in the United States to medicate every adult in the county with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month. On information and belief, the Opioid Diversion Enterprise has been ongoing for at least the last decade.

155. The Opioid Diversion Enterprise was and is a shockingly successful endeavor. It Opioid Diversion Enterprise has been conducting business uninterrupted since its genesis. It was

not until recently that United States and State regulators finally began to unravel the extent of the enterprise and the toll that it exacted on the American public.

156. At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the RICO Defendants; (d) characterized by interpersonal relationships among the RICO Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and then requesting the DEA increase production quotas, all so that the RICO Defendants would have a larger pool of prescription opioids from which to profit.

157. The Opioid Diversion Enterprise also engaged in efforts to lobby against the DEA's authority to hold the RICO Defendants liable for disregarding their duty to prevent diversion. Members of the Pain Care Forum (described in greater detail below) and the Healthcare Distribution Alliance lobbied for the passage of legislation to weaken the DEA's enforcement authority. The Ensuring Patient Access and Effective Drug Enforcement Act significantly reduced the DEA's ability to issue orders to show cause and to suspend and/or revoke registrations.

158. The Opioid Diversion Enterprise functioned by selling prescription opioids. While there are some legitimate uses and/or needs for prescription opioids, the RICO Defendants,

through their illegal enterprise, engaged in a pattern of racketeering activity, that involves a fraudulent scheme to increase revenue by violating state and federal laws requiring the maintenance of effective controls against diversion of prescription opioids, and the identification, investigation, and reporting of suspicious orders of prescription opioids destined for the illicit drug market. The goal of Defendants' scheme was to increase profits from opioid sales. Defendants' profits were limited by the production quotas set by the DEA, so the Defendants refused to identify, investigate and/or report suspicious orders of their prescription opioids being diverted into the illicit drug market. The result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and distribute for public consumption.

159. The Opioid Diversion Enterprise engaged in, and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across states lines, such as manufacture, sale, distribution, and shipment of prescription opioids throughout the County and this jurisdiction, and the corresponding payment and/or receipt of money from the sale of the same.

160. Within the Opioid Diversion Enterprise, there were interpersonal relationships and common communication by which the RICO Defendants shared information on a regular basis. These interpersonal relationships also formed the organization of the Opioid Diversion Enterprise. The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of racketeering activity.

161. Each of the RICO Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships, and

continuing coordination of activities. The RICO Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they each have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

162. The RICO Defendants exerted substantial control over the Opioid Diversion Enterprise by their membership in the Pain Care Forum, the HDA, and through their contractual relationships.

163. The Pain Care Forum ("PCF") has been described as a coalition of drugmakers, trade groups and dozens of non-profit organizations supported by industry funding. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

164. The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drugmakers and their allies shaped the national response to the ongoing wave of prescription opioid abuse." Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.

165. Not surprisingly, each of the RICO Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or participant in the PCF. In 2012, membership and participating organizations included the HDA (of which all RICO Defendants are members), Endo, Purdue, Johnson & Johnson (the parent company for Janssen

Pharmaceuticals), Actavis (i.e., Allergan), and Teva (the parent company of Cephalon). Each of the Manufacturer Defendants worked together through the PCF to advance the interests of the enterprise. But the Manufacturer Defendants were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA. Plaintiff is informed and believes that the Distributor Defendants participated directly in the PCF as well.

166. The 2012 Meeting Schedule for the Pain Care Forum indicates that meetings were held in the D.C. office of Powers Pyles Sutter & Verville on a monthly basis, unless otherwise noted. Local members were "encouraged to attend in person" at the monthly meetings.

167. The 2012 Pain Care Forum Meeting Schedule demonstrates that each of the Defendants participated in meetings on a monthly basis, either directly or through their trade organization, in a coalition of drugmakers and their allies whose sole purpose was to shape the national response to the ongoing prescription opioid epidemic, including the concerted lobbying efforts that the PCF undertook on behalf of its members.

168. Second, the HDA -- or Healthcare Distribution Alliance -- led to the formation of interpersonal relationships and an organization between the RICO Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants named in the Complaint, including Actavis (i.e., Allergan), Endo, Purdue, Mallinckrodt, and Cephalon were members of the HDA. The HDA and each of the Distributor Defendants, eagerly sought the active membership and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between Manufacturers and Distributors at high executive levels.

169. The HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections." Clearly, the HDA and the Distributor Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships between the Manufacturers and Defendants.

170. The application for manufacturer membership in the HDA further indicates the level of connection that existed between the RICO Defendants. The manufacturer membership application must be signed by a "senior company executive," and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company. The HDA application also requests that the manufacturer identify its current distribution information and its most recent year end net sales through any HDA distributors, including but not limited to, Defendants AmerisourceBergen, Cardinal Health, and McKesson.

171. After becoming members, the Distributors and Manufacturers were eligible to participate on councils, committees, task forces and working groups, including:

a. Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."

b. Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business

solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce." Participation in this committee includes distributors and manufacturer members.

c. Health, Beauty and Wellness Committee: "This committee conducts research, as well as creates and exchanges industry knowledge to help shape the future of the distribution for health, beauty and wellness/consumer products in the healthcare supply chain." Participation in this committee includes distributors and manufacturer members.

d. Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes distributors and manufacturer members.

e. Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel."

f. Bar Code Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.

g. eCommerce Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.

h. ASN Working Group: Participation includes Distributor, Manufacturer and Service Provider Members.

i. Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation includes Distributor and Manufacturer Members.

172. The councils, committees, task forces and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

173. The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues." The conferences also gave the Manufacturer and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry." The HDA and its conferences were significant opportunities for the Manufacturer and Distributor Defendants to interact at a high-level of leadership. And, the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.

174. Third, the RICO Defendants maintained their interpersonal relationships by working together and exchanging information and driving the unlawful sales of their opioids through their contractual relationships, including chargebacks and vault security programs.

175. The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids. As reported in the Washington Post, identified by Senator McCaskill, and acknowledged by the

HDA, there is an industry-wide practice whereby the Manufacturers paid the Distributors rebates and/or chargebacks on their prescription opioid sales. Upon information and belief, these contracts were negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer and Distributor Defendants. In return for the rebates and chargebacks, the Distributor Defendants provided the Manufacturer Defendants with detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices. The Manufacturer Defendants used this information to gather high-level data regarding overall distribution and direct the Distributor Defendants on how to most effectively sell the prescription opioids.

176. The contractual relationships among the RICO Defendants also include vault security programs. The RICO Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opiates. Plaintiff is informed and believes that manufacturers negotiated agreements whereby the Manufacturers installed security vaults for Distributors in exchange for agreements to maintain minimum sales performance thresholds. Plaintiff is informed and believes that these agreements were used by the RICO Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

177. Taken together, the interaction and length of the relationships between and among the Manufacturer and Distributor Defendants reflects a deep level of interaction and cooperation between two groups in a tightly knit industry. The Manufacturer and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The RICO Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the Pain

Care Forum are but two examples of the overlapping relationships and concerted joint efforts to accomplish common goals and demonstrates that the leaders of each of the RICO Defendants was in communication and cooperation.

178. From 2006 to 2016 the Distributors and Manufacturers worked together through the Pain Care Forum to spend over $740 million lobbying in the nation's capital and in all 50 statehouses on issues including opioid-related measures. Similarly, the HDA has continued its work on behalf of Distributors and Manufacturers, without interruption, since at least 2000, if not longer.

179. As described above, the RICO Defendants began working together as early as 2006 through the Pain Care Forum and/or the HDA to promote the common purpose of their enterprise. Plaintiff is informed and believes that the RICO Defendants worked together as an ongoing and continuous organization throughout the existence of their enterprise.

## B. CONDUCT OF THE OPIOID DIVERSION ENTERPRISE

180. During the time period alleged in this Complaint, the RICO Defendants exerted control over, conducted and/or participated in the Opioid Diversion Enterprise by fraudulently failing to comply with their Federal and State obligations to identify, investigate and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market, to halt such unlawful sales and, in doing so, to increase production quotas and generate unlawful profits, as follows:

181. Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to maintain effective controls against diversion of their prescription opioids.

182. Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids.

183. Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

184. Defendants paid nearly $800 million dollars to influence local, state and federal governments through joint lobbying efforts as part of the Pain Care Forum. The RICO Defendants were all members of their Pain Care Forum either directly or indirectly through the HDA. The lobbying efforts of the Pain Care Forum and its members included efforts to pass legislation making it more difficult for the DEA to suspend and/or revoke the Manufacturers' and Distributors' registrations for failure to report suspicious orders of opioids.

185. The RICO Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

186. The RICO Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."

187. The RICO Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Plaintiff is informed and believes that the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured. Plaintiff is informed and believes that the

Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

188. The Manufacturer Defendants lobbied the DEA to increase Aggregate Production Quotas, year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by the RICO Defendants.

189. The Distributor Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007, was intended to help the RICO Defendants identify suspicious orders or customers who were likely to divert prescription opioids. On information and belief, the "know your customer" questionnaires informed the RICO Defendants of the number of pills that the pharmacies sold, how many non-controlled substances are sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

190. The RICO Defendants refused to identify, investigate, and report suspicious orders to the DEA when they became aware of the same despite their actual knowledge of drug diversion rings. The RICO Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against the Distributor Defendants in 178 registrant actions between 2008 and 2012 and 117 recommended decision in registrant actions from The Office of Administrative Law Judges. These numbers include seventy-six actions involving orders to show cause and forty-one actions involving immediate suspension orders -- all for failure to report suspicious orders.

191. Defendants' scheme had decision-making structure that was driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control the State and Federal Government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and identify suspicious orders and report them to the DEA.

192. The RICO Defendants worked together to control the flow of information and influence state and federal governments and political candidates to pass legislation that was pro-opioid. The Manufacturer and Distributor Defendants did this through their participation in the Pain Care Forum and Healthcare Distributors Alliance.

193. The RICO Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA stayed high and ensured that suspicious orders were not reported to the DEA. By not reporting suspicious orders or diversion of prescription opioids, the RICO Defendants ensured that the DEA had no basis for refusing to increase or decrease the production quotas for prescription opioids due to diversion of suspicious orders. The RICO Defendants influenced the DEA production quotas in the following ways:

a. The Distributor Defendants assisted the enterprise and the Manufacturer Defendants in their lobbying efforts through the Pain Care Forum;

b. The Distributor Defendants invited the participation, oversight and control of the Manufacturer Defendants by including them in the HDA, including on the councils, committees, task forces, and working groups;

c. The Distributor Defendants provided sales information to the Manufacturer Defendants regarding their prescription opioids, including reports of all opioids prescriptions filled by the Distributor Defendants;

d. The Manufacturer Defendants used a chargeback program to ensure delivery of the Distributor Defendants' sales information;

e. The Manufacturer Defendants obtained sales information from QuintilesIMS (formerly IMS Health) that gave them a "stream of data showing how individual doctors across the nation were prescribing opioids."

f. The Distributor Defendants accepted rebates and chargebacks for orders of prescription opioids;

g. The Manufacturer Defendants used the Distributor Defendants' sales information and the data from QuintilesIMS to instruct the Distributor Defendants to focus their distribution efforts to specific areas where the purchase of prescription opioids was most frequent;

h. The RICO Defendants identified suspicious orders of prescription opioids and then continued filling those unlawful orders, without reporting them, knowing that they were suspicious and/or being diverted into the illicit drug market;

i. The RICO Defendants refused to report suspicious orders of prescription opioids despite repeated investigation and punishment of the Distributor Defendants by the DEA for failure to report suspicious orders; and

j. The RICO Defendants withheld information regarding suspicious orders and illicit diversion from the DEA because it would have revealed that the "medical

need" for and the net disposal of their drugs did not justify the production quotas set by the DEA.

194. The scheme devised and implemented by the RICO Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, and all designed and operated to ensure the continued unlawful sale of controlled substances.

## C. PATTERN OF RACKETEERING ACTIVITY.

195. The RICO Defendants conducted and participated in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(B), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343); and 18 U.S.C. § 1961(D) by the felonious manufacture, importation, receiving, concealment buying selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

### 1. The RICO Defendants Engaged in Mail and Wire Fraud.

196. The RICO Defendants carried out, or attempted to carry out, a scheme to defraud federal and state regulators, and the American public by knowingly conducting or participating in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

197. The RICO Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the RICO Defendants committed, or aided and abetted in the commission of, were related to

each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Diversion Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

198. The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

199. In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

200. The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a. Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to

design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

b. Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

201. The RICO Defendants' use of the mail and wires includes, but is not limited to, the transmission, delivery, or shipment of the following by the Manufacturers, Distributors, or third parties that were foreseeably caused to be sent as a result of the RICO Defendants' illegal scheme, including but not limited to:

a. The prescription opioids themselves;

b. Documents and communications that facilitated the manufacture, purchase and unlawful sale of prescription opioids;

c. Defendants' DEA registrations;

d. Documents and communications that supported and/or facilitated Defendants' DEA registrations;

e. Documents and communications that supported and/or facilitated the Defendants' request for higher aggregate production quotas, individual production quotas, and procurement quotas;

f. Defendants' records and reports that were required to be submitted to the DEA pursuant to 21 U.S.C. § 827;

g. Documents and communications related to the Defendants' mandatory DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;

h. Documents intended to facilitate the manufacture and distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports and correspondence;

i. Documents for processing and receiving payment for prescription opioids;

j. Payments from the Distributors to the Manufacturers;

k. Rebates and chargebacks from the Manufacturers to the Distributors;

l. Payments to Defendants' lobbyists through the Pain Care Forum;

m. Payments to Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

n. Deposits of proceeds from Defendants' manufacture and distribution of prescription opioids; and

o. Other documents and things, including electronic communications.

202. On information and belief, the RICO Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of prescription opioids and related documents by mail or by private carrier affecting interstate commerce, including the following:

203. Purdue manufactures multiple forms of prescription opioids, including but not limited to: OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER. Purdue manufactured and shipped these prescription opioids to the Distributor Defendants in this jurisdiction.

204. The Distributor Defendants shipped Purdue's prescription opioids throughout this jurisdiction.

205. Cephalon manufactures multiple forms of prescription opioids, including but not limited to: Actiq and Fentora. Cephalon manufactured and shipped these prescription opioids to the Distributor Defendants in this jurisdiction.

206. The Distributor Defendants shipped Teva's prescription opioids throughout this jurisdiction.

207. Janssen manufactures prescription opioids known as Duragesic. Janssen manufactured and shipped its prescription opioids to the Distributor Defendants in this jurisdiction.

208. The Distributor Defendants shipped Janssen's prescription opioids throughout this jurisdiction.

209. Endo manufactures multiple forms of prescription opioids, including but not limited to: Opana/Opana ER, Percodan, Percocet, and Zydone. Endo manufactured and shipped its prescription opioids to the Distributor Defendants in this jurisdiction.

210. The Distributor Defendants shipped Janssen's prescription opioids throughout this jurisdiction.

211. Actavis manufactures multiple forms of prescription opioids, including but not limited to: Kadin and Norco, as well as generic versions of the drugs known as Kadian, Duragesic and Opana. Actavis manufactured and shipped its prescription opioids to the Distributor Defendants in this jurisdiction.

212. The Distributor Defendants shipped Actavis' prescription opioids throughout this jurisdiction.

213. Mallinckrodt manufactures multiple forms of prescription opioids, including but not limited to: Exalgo and Roxicodone.

214. The Distributor Defendants shipped Mallinckrodt's prescription opioids throughout this jurisdiction.

215. The RICO Defendants also used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities. Specifically, the RICO Defendants made misrepresentations about their compliance with Federal and State laws requiring them to identify, investigate and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market.

216. At the same time, the RICO Defendants misrepresented the superior safety features of their order monitoring programs, ability to detect suspicious orders, commitment to preventing diversion of prescription opioids and that they complied with all state and federal regulations regarding the identification and reporting of suspicious orders of prescription opioids.

217. Plaintiff is also informed and believes that the RICO Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales, and to transmit payments and rebates/chargebacks.

218. The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail and with various other affiliates, regional offices, regulators, distributors, and other third-party entities in furtherance of the scheme.

219. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and the public that Defendants were complying with their state and federal obligations to identify and report suspicious orders of prescription opioids all while Defendants were knowingly allowing millions

of doses of prescription opioids to divert into the illicit drug market. The RICO Defendants' scheme and common course of conduct was intended to increase or maintain high production quotas for their prescription opioids from which they could profit.

220. Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records. But Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

221. The RICO Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. These actions violate 18 U.S.C. § 1962(c). Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with the RICO Defendants in these offenses and have performed acts in furtherance of the scheme to increase revenues, increase market share, and /or minimize the losses for the RICO Defendants.

222. The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

223. The RICO Defendants hid from the general public, and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities, about the reality of the suspicious orders that the RICO Defendants were filling on a daily basis -- leading to the diversion of a tens of millions of doses of prescriptions opioids into the illicit market.

224. The RICO Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

225. Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding marketing prescription opioids and refusing to report suspicious orders.

226. As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

227. The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants while Plaintiff was left with substantial injury to its business through the damage that the prescription opioid epidemic caused. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Opioid Diversion Enterprise and in furtherance of its fraudulent scheme.

228. The pattern of racketeering activity alleged herein and the Opioid Diversion Enterprise are separate and distinct from each other. Likewise, Defendants are distinct from the enterprise.

229. The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue unless enjoined by this Court.

230. Many of the precise dates of the RICO Defendants' criminal actions at issue here have been hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioids Addiction and Opioid Diversion Enterprise alleged herein depended upon secrecy.

231. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers in this jurisdiction and the Plaintiff. Defendants calculated and intentionally crafted the Opioid Diversion Enterprise and their scheme to increase and maintain their increased profits, without regard to the effect such behavior would have on consumers in this jurisdiction, its citizens or the Plaintiff. In designing and implementing the scheme, at all times Defendants were cognizant of the fact that those in the manufacturing and distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and reliable information regarding Defendants' products and their manufacture and distribution of those products. The Defendants were also aware that Plaintiff and the citizens of this jurisdiction rely on the Defendants to maintain a closed system and to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

232. By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

233. It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations, would harm Plaintiff by allowing the flow of prescriptions opioids from appropriate medical channels into the illicit drug market.

234. The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

**2. The RICO Defendants Manufactured, Sold and/or Dealt in Controlled Substances and Their Crimes Are Punishable as Felonies.**

235. The RICO Defendants conducted and participated in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(D) by the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

236. The RICO Defendants committed crimes that are punishable as felonies under the laws of the United States. Specifically, 21 U.S.C. § 483(a)(4) makes it unlawful for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material information from, any application, report, record or other document required to be made, kept or filed under this subchapter. A violation of section 483(a)(4) is punishable by up to four years in jail, making it a felony.

237. Each of the RICO Defendants qualify as registrants under the CSA. Their status as registrants under the CSA requires that they maintain effective controls against diversion of controlled substances in schedule I or II, design and operate a system to disclose to the registrant suspicious orders of controlled substances, and inform the DEA of suspicious orders when discovered by the registrant.

238. Pursuant to the CSA and the Code of Federal Regulations, the RICO Defendants were required to make reports to the DEA of any suspicious orders identified through the design and operation of their system to disclose suspicious orders.

239. The RICO Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders, and/or omitted material information from reports, records and other document required to be filed with the DEA including the Manufacturer Defendants' applications for production quotas. Specifically, the RICO Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market and failed to report this information to the DEA in their mandatory reports and their applications for production quotas.

240. For example, The DEA and DOJ began investigating McKesson in 2013 regarding its monitoring and reporting of suspicious controlled substances orders. On April 23, 2015, McKesson filed a Form-8-K announcing a settlement with the DEA and DOJ wherein it admitted to violating the CSA and agreed to pay $150 million and have some of its DEA registrations suspended on a staggered basis. The settlement was finalized on January 17, 2017.

241. Purdue's experience in Los Angeles is another striking example of Defendants' willful violation of the CSA and Code of Federal Regulations as it relates to reporting suspicious orders of prescription opioids. In 2016, the Los Angeles Times reported that Purdue was aware of a pill mill operating out of Los Angeles yet failed to alert the DEA. The LA Times uncovered that Purdue began tracking a surge in prescriptions in Los Angeles, including one prescriber in particular. A Purdue sales manager spoke with company officials in 2009 about the prescriber, asking "Shouldn't the DEA be contacted about this?" and adding that she felt "very certain this is an organized drug ring." Despite knowledge of the staggering amount of pills being issued in Los Angeles, and internal discussion of the problem, "Purdue did not shut off the supply of highly addictive OxyContin and did not tell authorities what it knew about Lake Medical until several

years later when the clinic was out of business and its leaders indicted. By that time, 1.1 million pills had spilled into the hands of Armenian mobsters, the Crips gang and other criminals."

242. Finally, Mallinckrodt was recently the subject of a DEA and Senate investigation for its opioid practices. Specifically, in 2011, the DEA targeted Mallinckrodt arguing that it ignored its responsibility to report suspicious orders as 500 million of its pills ended up in Florida between 2008 and 2012. After six years of DEA investigation, Mallinckrodt agreed to a settlement involving a $35 million fine. Federal prosecutors summarized the case by saying that Mallinckrodt's response was that everyone knew what was going on in Florida, but they had no duty to report it.

243. Plaintiff is informed and believes that the foregoing examples reflect the RICO Defendants' pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74. This conclusion is supported by the sheer volume of enforcement actions available in the public record against the Distributor Defendants. For example:

a. On April 24, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

b. On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against

diversion of hydrocodone. This number accounted for 66% of all oxycodone sold in the state of Florida during that time.

c. On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

d. On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

e. On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

f. On May 2, 2008, McKesson Corporation entered into an Administrative Memorandum of Agreement ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

g. On September 30, 2008, Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford

Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

h. On February 2, 2012, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j. On January 5, 2017, McKesson Corporation entered into an Administrative Memorandum Agreement with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at several of its facilities.

244. These actions against the Distributor Defendants confirm that the Distributors knew they had a duty to maintain effective controls against diversion, design and operate a system to disclose suspicious orders, and to report suspicious orders to the DEA. These actions also demonstrate, on information and belief, that the Manufacturer Defendants were aware of the enforcement against their Distributors and the diversion of the prescription opioids and a corresponding duty to report suspicious orders.

245. The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint.

246. Many of the precise dates of Defendants' criminal actions at issue herein were hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioid Diversion Enterprise depended upon the secrecy of the participants in that enterprise.

247. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers in this jurisdiction and Toria. Defendants calculated and intentionally crafted the diversion scheme to increase and maintain profits from unlawful sales of opioids, without regard to the effect such behavior would have on this jurisdiction, its citizens or Toria. The Defendants were aware that Toria and the citizens of this jurisdiction rely on the Defendants to maintain a closed system of manufacturing and distribution to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

248. By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

249. It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations, would harm Toria and other consumers by allowing the flow of prescriptions opioids from appropriate medical channels into the illicit drug market.

250. The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

**3. The Actions of the Sackler Defendants**

251. Upon information and belief, the Sackler Defendants exercised enormous control over the Purdue Entities, including approving, directing, or otherwise exerting control over Purdue's deceptive marketing practices.

252. At all times relevant to this action, the Sackler Defendants knew the Purdue opioid products were dangerous, addictive, and being abused. Rather than address these issues, however, the Sackler Defendants instead planned to blame those who became addicted and, possibly, selling the Purdue Entities to avoid financial sanctions for their acts following a criminal investigation.

253. The Sackler Defendants, through the Purdue Entities, intending to defraud or mislead, marketed opioids as less addictive and more effective than they actually knew or should have know the opioids were.

254. The Sackler Defendants each signed an agreement with the U.S. government ensuring that the Purdue Entities did not deceived doctors or patients regarding opioids.

255. Even after making representations to the U.S. government, the Sackler Defendants knew that the Purdue Entities continued to market and sell opioids in a deceptive or fraudulent manner, including, for example, assertions that physical dependence on opioids was beneficial for improving patients' lives and was not dangerous.

256. Over time, the Sackler Defendants expressed great concern for increasing the number of prescriptions and the sales numbers for opioids while expressing little or no concern for data on addiction, abuse, or death from opioids.

257. The Sackler Defendants and Purdue Entities knew that there were serious concerns with addiction, resulting in part from their sales strategies, but rather than address the concerns they simply looked for new ways to profit from addiction treatment for patients

addicted to the products for which the Sackler Defendants oversaw and approved the deceptive marketing and sales.

258. In the past ten-plus years, the Sackler Defendants, through their control of the board of the Purdue Entities, approved the transfer of billions of dollars to themselves in anticipation of the Purdue Entities being held liable for criminal or civil liability and judgment.

**D. DAMAGES**

259. The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Toria's addiction and eventual death, as described above in language expressly incorporated herein by reference.

260. Plaintiff's damages were proximately caused by Defendants' racketeering activities. But for the RICO Defendants' conduct, Toria would not have become addicted and died, in addition to the other damages he suffered, as described above and incorporated herein, including damages for Toria's wrongful death and for Toria's bodily injury, and associated damages, pre-death. To the extent necessary, the claim for pre-death damages may be considered a survival action or survival claim.

261. Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

**NINTH**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. 1962(d), et seq.**
**(Against All RICO Defendants)**

262. Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

263. Plaintiff brings this claim on its own behalf against all RICO Defendants. At all relevant times, the RICO Defendants were associated with the Opioid Diversion Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, they agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). Under Section 1962(d) it is unlawful for "any person to conspire to violate" Section 1962(d), among other provisions.

264. Defendants conspired to violate Section 1962(c), as alleged more fully above, by conducting the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity, as incorporated by reference below.

**A. THE OPIOID DIVERSION ENTERPRISE.**

265. For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the paragraphs set forth above concerning the "Opioid Diversion Enterprise."

**B. CONDUCT OF THE OPIOID DIVERSION ENTERPRISE.**

266. For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the paragraphs set forth above concerning the "Conduct of the Opioid Diversion Enterprise."

**C. PATTERN OF RACKETEERING ACTIVITY.**

267. For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the paragraphs set forth above concerning the "Pattern of Racketeering Activity."

**D. DAMAGES.**

268. The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Toria's addiction and eventual death, as described above in language expressly incorporated herein by reference.

269. Plaintiff's damages were proximately caused by Defendants' racketeering activities. But for the RICO Defendants' conduct, Toria would not have become addicted and died, in addition to the other damages he suffered, as described above and incorporated herein, including damages for Toria's wrongful death and for Toria's bodily injury, and associated damages, pre-death. To the extent necessary, the claim for pre-death damages may be considered a survival action or survival claim.

270. Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

## TENTH CAUSE OF ACTION
**Nuisance**
**(Against all Defendants)**

271. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

272. Defendants' unlawful actions have created a nuisance under North Carolina law, and Toria's addiction and death were the direct result of Defendants' failure to abate that nuisance.

273. The Defendants have intentionally and/or unlawfully created a nuisance.

274. Toria and the residents of Toria's Community had a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety, and to be

free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

275. Defendants intentionally, unlawfully, and recklessly manufacture, market, distribute, and sell prescription opioids that Defendants know, or reasonably should know, will be diverted, causing widespread distribution of prescription opioids in and/or to Toria's Community, resulting in addiction and abuse, an elevated level of crime, death and injuries to the residents of Toria's Community, a higher level of fear, discomfort and inconvenience to the residents of Toria's Community, and direct costs to Toria's Community.

276. Defendants unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be diverted such as to injure the Toria's Community and its residents.

277. Defendants unlawfully and/or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion. Such conduct was illegal. Defendants' failures to maintain effective controls against diversion include Defendants' failure to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders.

278. Defendants' conduct in illegally distributing and selling prescription opioids, or causing such opioids to be distributed and sold, where Defendants know, or reasonably should know, such opioids will be diverted and possessed and/or used illegally Toria's Community is of a continuing nature.

279. A violation of any rule or law controlling the distribution of a drug of abuse in Toria's Community and the State is a public nuisance.

280. Defendants' distribution of opioids while failing to maintain effective controls against diversion was proscribed by statute and regulation.

281. Defendants' ongoing conduct produced an ongoing nuisance, as the prescription opioids that they allow and/or cause to be illegally distributed and possessed in Toria's Community were diverted, leading to abuse, addiction, crime, and public health costs.

282. Defendants knew, or reasonably should have known, that their conduct had an ongoing detrimental effect upon the public health, safety and welfare, and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

283. Defendants knew, or reasonably should have known, that their conduct caused an unreasonable invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

284. Defendants were aware, and at a bare minimum certainly should have been aware, of the unreasonable interference that their conduct caused in Toria's Community. Defendants are in the business of manufacturing, marketing, selling, and distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous under federal law.

285. Defendants' conduct in marketing, distributing, and selling prescription opioids which the defendants know, or reasonably should know, were likely to be diverted for non-legitimate, non-medical use, created a strong likelihood that these illegal distributions of opioids will cause death and injuries to residents in Toria's Community and otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

286. It was, or should have been, reasonably foreseeable to defendants that their conduct would cause deaths and injuries to residents in Toria's Community, and would otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the

public's right to be free from disturbance and reasonable apprehension of danger to person and property.

287. The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes in Toria's Community not only caused deaths and injuries, but also created a palpable climate of fear among residents in Toria's Community where opioid diversion, abuse, addiction are prevalent and where diverted opioids tend to be used frequently.

288. Defendants' conduct made it easier for persons to divert prescription opioids, constituting a dangerous threat to the public.

289. Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes. Because of Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

290. Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in Toria's Community, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids or caused opioids to be distributed without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt

suspicious orders of opioids and caused such orders to be shipped. Defendants intentionally and/or unlawfully marketed opioids in manners they knew to be false and misleading. Such actions were inherently dangerous.

291. Defendants knew the prescription opioids had a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids or caused such opioids to be distributed without maintaining effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse nuisance in Toria's Community.

292. Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm and did cause substantial harm.

293. Defendants' conduct in creating, maintaining, and failing to abate the nuisance caused by their actions was a direct and proximate cause of injury and death to Toria.

294. As a direct and proximate result of Defendants' actions, Toria suffered injury and death and Defendants are liable to Plaintiff in an amount in excess of $25,000.00, including damages for Toria's wrongful death and for Toria's bodily injury, and associated damages, pre-death. To the extent necessary, the claim for pre-death damages may be considered a survival action or survival claim.

## ELEVENTH CAUSE OF ACTION
### Piercing the Corporate Veil
### (All Sackler Defendants)

295. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

296. At all times relevant to this action, the Sackler Defendants were officers, board members, or otherwise controlled Purdue Pharma L.P., Purdue Pharma Inc., and/or Purdue Frederick Company, Inc. (hereinafter collectively referred to as the "Purdue Entities").

297. Upon information and belief, the Purdue Entities have filed for Federal bankruptcy protection, shielding them from responsibility or liability for the harms they have caused as a manufacturer, marketer, seller, and distributor of opioids. The foregoing allegations pertaining to Manufacturing Defendants and Distributor Defendants would apply to the Purdue Entities were they not currently in bankruptcy.

298. Upon information and belief, the Sackler Defendants knowingly and fraudulent withdrew or are withdrawing billions of dollars from the Purdue Entities specifically to shield the profits of the Purdue Entities and the wealth of the Sackler Defendants from legal judgment.

299. The Sackler Defendants' knowing and fraudulent withdrawal of funds disregarded the corporate form of the Purdue Entities, was done to protect the funds from legal judgment or disbursement in bankruptcy, demonstrates their total control over the Purdue Entities, demonstrates their use of the Purdue Entities as the personal bank accounts of the Sackler Defendants, and should bar the Sackler Defendants from relying on the shields of corporate forms and bankruptcy protection.

300. The Sackler Defendants have used the corporate form of the Purdue Entities to shield themselves from exposure to their own wrongful acts and the wrongful acts of the Purdue Entities, as described above.

301. Plaintiff prays that the Court pierce the corporate veil of the Purdue Entities, and pierce the bankruptcy protections offered the Purdue Entities, to the extent necessary to reach the assets of the Sackler Defendants, in that the Sackler Defendants were the alter ego of the Purdue

Entities, and the Sackler Defendants used the Purdue Entities in accomplishing the wrongs described herein and causing Plaintiff's associated damages, including both the wrongful death damages arising from Toria's death and the personal bodily injury damages suffered by Toria. pre-death. To the extent necessary, the claim for pre-death damages may be considered a survival action or survival claim.

WHEREFORE, Plaintiff, having complained of Defendants, respectfully requests this Court grant her the following relief:

1. Plaintiff have and recover a judgment against all Defendants, jointly and severally, for compensatory damages for Toria's wrongful death, in an amount in excess of $25,000.00;

2. Plaintiff have and recover a judgment against all Defendants, jointly and severally, for compensatory damages for Toria's damages suffered pre-death, in an amount in excess of $25,000.00

3. Plaintiff have and recover a judgment against Defendants, jointly and severally, for trebled compensatory damages in excess of $25,000.00, attorneys' fees, and costs, pursuant to Chapter 75 of the North Carolina General Statutes;

4. Plaintiff have and recover punitive damages against Defendants, jointly and severally, for the gross, intentional, willful, and wanton conduct, described above, in the greatest amount permitted by law and Chapter 1D of the North Carolina General Statutes;

5. Plaintiff have and recover all applicable costs, interest, and attorneys' fees, in the greatest amount permitted by law;

6. For a trial by jury on all issues so triable; and

7. For such further relief as this Court deems just and proper.

This the _____ day of January, 2020.

Garry Whitaker
*Attorney for Plaintiff*

**GARRY WHITAKER LAW, P.C.**
One N. Marshall Street, Suite 350
Winston-Salem, NC 27101
Telephone: 336-777-1195
GarryWhitaker@GarryWhitakerlaw.com

Paul D. Coates
*Attorney for Plaintiff*

**PINTO COATES KYRE & BOWERS, PLLC**
3203 Brassfield Road
Greensboro, NC 27410
Telephone: 336-282-8848
PCoates@pckb-law.com

Book 126 Page 4013

FEB 14 2018

2018906502

D 126 4013

NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES
N.C. VITAL RECORDS
# CERTIFICATE OF DEATH

REGISTRATION DISTRICT NO. 03495 LOCAL NO. 540 COUNTY OF DEATH Forsyth STATE FILE NO.

**DECEDENT** — TYPE/PRINT IN PERMANENT BLACK, BLUE-BLACK OR BLUE INK

Toria Capri Stevens — NAME OF DECEDENT (For use by Physician, Institution or Medical Examiner)

DECEDENT'S LEGAL NAME

| 1a. FIRST | 1b. MIDDLE | 1c. LAST | 1d. SUFFIX | 1e. LAST NAME PRIOR TO FIRST MARRIAGE |
|---|---|---|---|---|
| Toria | Capri | Stevens | | - |

| 2. SEX | 3a. AGE-LAST BIRTHDAY (Yrs) | 3b. UNDER 1 YEAR Months / Days | 3c. UNDER 1 DAY Hours / Minutes | 4. DATE OF BIRTH (Month/Day/Year) | 5. BIRTHPLACE (County/State or Foreign Country) | 6. DATE OF DEATH (Month/Day/Year) |
|---|---|---|---|---|---|---|
| F | 22 | | | [redacted] | FL | January 22, 2018 |

PLACE OF DEATH (Check only one)
7a. IF DEATH OCCURRED IN A HOSPITAL ☐ Inpatient ☐ ER/Outpatient ☐ DOA
7b. IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL ☐ Hospice facility ☐ Nursing home/Long term care facility ☒ Decedent's home ☐ Other (Specify)

| 7c. FACILITY NAME (If not institution, give street and number) | 7d. CITY OR TOWN | 7e. COUNTY OF DEATH |
|---|---|---|
| 4151 Aquadale Lane | Winston-Salem | Forsyth |

| 8. MARITAL STATUS | 9. SURVIVING SPOUSE (Give name prior to first marriage) | 10a. DECEDENT'S USUAL OCCUPATION (Do not use retired) | 10b. KIND OF BUSINESS/INDUSTRY |
|---|---|---|---|
| ☐ Married ☐ Married, but separated ☐ Widowed ☐ Divorced ☒ Never married ☐ Unknown | | Student | College |

| 11. SOCIAL SECURITY NUMBER | 12a. RESIDENCE–STATE OR FOREIGN COUNTRY | 12b. COUNTY | 12c. CITY OR TOWN |
|---|---|---|---|
| [redacted] | North Carolina | Forsyth | Winston-Salem |

| 12d. STREET AND NUMBER | 12e. INSIDE CITY LIMITS | 12f. ZIP CODE | 13. WAS DECEDENT EVER IN U.S. ARMED FORCES? |
|---|---|---|---|
| 4151 Aquadale Lane | ☒ Yes ☐ No | 27104 | ☐ Yes ☒ No |

14. DECEDENT'S EDUCATION (Check the box that best describes the highest degree or level of school completed at the time of death)
☐ 8th grade or less
☐ 9th–12th grade; no diploma
☐ High school graduate or GED completed
☒ Some college credit, but no degree
☐ Associate degree (e.g., AA, AS)
☐ Bachelor's degree (e.g., BA, AB, BS)
☐ Master's degree (e.g., MA, MS, MEng, MEd, MSW, MBA)
☐ Doctorate (e.g., PhD, EdD) or Professional degree (e.g., MD, DDS, DVM, LLB, JD)

15. DECEDENT OF HISPANIC ORIGIN? (Check the box that best describes whether the decedent is Spanish/Hispanic/Latino. Check the "No" box if decedent is not Spanish/Hispanic/Latino)
☒ No, not Spanish/Hispanic/Latino
☐ Yes, Mexican, Mexican American, Chicano
☐ Yes, Puerto Rican
☐ Yes, Cuban
☐ Yes, other Spanish/Hispanic/Latino (Specify)

16. DECEDENT'S RACE (Check one or more races to indicate what the decedent considered himself or herself to be)
☒ White ☐ Black or African American ☐ American Indian or Alaska Native (Name of the enrolled or principal tribe) ☐ Asian Indian ☐ Chinese ☐ Filipino ☐ Japanese ☐ Korean ☐ Vietnamese ☐ Other Asian (Specify) ☐ Native Hawaiian ☐ Guamanian or Chamorro ☐ Samoan ☐ Other Pacific Islander (Specify) ☐ Other (Specify)

**PARENTS**

| 17. FATHER'S NAME (First, Middle, Last) | 18. MOTHER'S NAME PRIOR TO FIRST MARRIAGE (First, Middle, Last) |
|---|---|
| Mark Lawrence Stevens | Susan Jean Kelley |

| 19a. INFORMANT'S NAME | 19b. RELATIONSHIP TO DECEDENT | 19c. MAILING ADDRESS (Street and Number, City, State, Zip Code) |
|---|---|---|
| Susan Stevens | Mother | 909 Loblolly Drive, Lewisville, NC 27023 |

**DISPOSITION**

| 20a. METHOD OF DISPOSITION | 20b. PLACE OF DISPOSITION (Name of cemetery, crematory, other place) | 20c. LOCATION (City or Town and State) |
|---|---|---|
| ☐ Burial ☒ Cremation ☐ Donation ☐ Entombment ☐ Removal from State ☐ Other (Specify) | Salem Crematory | Winston-Salem, NC |

| 21a. SIGNATURE OF FUNERAL DIRECTOR | 21b. LICENSE NUMBER | 21c. NAME OF EMBALMER | 21d. LICENSE NUMBER |
|---|---|---|---|
| [signature] | FD-3119 | Not Embalmed | |

22. NAME AND ADDRESS OF FUNERAL HOME
Salem Funeral & Cremation Service, 120 South Main Street, Winston-Salem, NC 27101

**MEDICAL CERTIFICATION**

BURIAL/CREMATION PERMIT — Medical Examiner: Authorization for Disposition/Transportation. After the medical examiner completes and signs this Burial transit permit/cremation authorization, it constitutes authority for burial, cremation, transportation or removal from the state. A copy of this form serves as a Burial/Cremation Permit.

23. Part I. Enter the chain of events (diseases, injuries or complications) that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology on lines b, c and/or d. Enter only one cause on a line. DO NOT ABBREVIATE. — Approximate interval: Onset to death

IMMEDIATE CAUSE (Final disease or condition resulting in death) → a. Pending
Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST
b. Due to (or as a consequence of)
c. Due to (or as a consequence of)
d. Due to (or as a consequence of)

CAUSE AMENDED MAY 10 2018 SUPPLEMENTAL REVERSE SIDE

PART II. Other significant conditions contributing to death but not resulting in the underlying cause given in PART I.

| 24a. WAS AN AUTOPSY PERFORMED? | 24b. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? |
|---|---|
| ☒ Yes ☐ No | ☒ Yes ☐ No |

| 25. MANNER OF DEATH | 26a. WAS CASE REFERRED TO MEDICAL EXAMINER? | 27. TIME OF DEATH (Approximate) | 28. DID TOBACCO USE CONTRIBUTE TO DEATH? | 29. IF FEMALE: |
|---|---|---|---|---|
| ☐ Natural ☐ Homicide ☐ Accident ☒ Pending ☐ Suicide ☐ Cannot be determined | ☒ Yes ☐ No; 26b. IF YES ☐ Declined by Medical Examiner | unknown | ☐ Yes ☐ Probably ☐ No ☒ Unknown | ☐ Pregnant at time of death ☐ Not pregnant within past year ☐ Not pregnant, but pregnant within 42 days of death ☐ Not pregnant, but pregnant 43 days to 1 year before death ☒ Unknown if pregnant within the past year |

**MEDICAL EXAMINER ONLY**

| 30. DATE PRONOUNCED (Month/Day/Year) | 31a. DATE OF INJURY (Month/Day/Year) | 31b. TIME OF INJURY | 31c. INJURY AT WORK? | 31d. PLACE OF INJURY—at home, farm, street, factory, office, building, etc. | 31e. IF TRANSPORTATION INJURY SPECIFY: |
|---|---|---|---|---|---|
| January 22, 2018 | | | ☐ Yes ☐ No | | ☐ Driver/Operator ☐ Passenger ☐ Pedestrian ☐ Other (Specify) |

31f. DESCRIBE HOW INJURY OCCURRED — 31g. LOCATION OF INJURY (Street/Number/City/State)

**CERTIFIER**

32. CERTIFIER (Check only one)
☐ Certifying physician/nurse practitioner/physician assistant – To the best of my knowledge, death occurred at the time, date, and place, and due to the cause(s) and manner stated.
☒ Medical Examiner – On the basis of examination, and/or investigation, in my opinion death occurred at the time, date, and place, and due to the cause(s) and manner stated.

9995

| 33a. SIGNATURE AND TITLE OF CERTIFIER | 33b. LICENSE NUMBER | 33c. DATE SIGNED (Month/Day/Year) |
|---|---|---|
| [signature], DO | 2014-02532 | January 24, 2018 |

33d. NAME AND ADDRESS OF CERTIFIER (Print legibly): Tiffany Erin O'Neill, DO, Wake Forest Baptist Medical Center, Winston Salem, NC
36. DATE REGISTERED BY STATE: MAR 14 2018

**REGISTRAR**

34. FOR LOCAL REGISTRAR (Name): [signature] KB — 35. DATE FILED (Month/Day/Year): JAN 29 2018

DATE CORRECTED — ITEM(S) CORRECTED:
DATE AMENDED (Mo/Day/Yr) — ITEM(S) AMENDED:

Substitute for DHHS 1672 (REVISED 06/15) N.C. VITAL RECORDS

EXHIBIT A

NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES
N.C. VITAL RECORDS

**SUPPLEMENTAL REPORT OF CAUSE OF DEATH** 18-007901

MAY 08 2018

***IMPORTANT NOTE:*** *Please be sure to transfer* ***ALL*** *data from the original certificate that you intend to be reported as the* ***final*** *cause(s)/conditions and events of the death.*

DECEDENT'S LEGAL NAME

| FIRST | MIDDLE | LAST | SUFFIX | LAST NAME PRIOR TO FIRST MARRIAGE |
|---|---|---|---|---|
| Toria | Capri | Stevens | | |

| SEX | DECEDENT'S RACE | COUNTY OF DEATH | DATE OF DEATH (Month/Day/Year) |
|---|---|---|---|
| F | Caucasian | Forsyth | January 22, 2018 |

23. Part I. Enter the chain of events (diseases, injuries or complications) that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology on lines b, c and/or d. Enter only one cause on a line. DO NOT ABBREVIATE.

| | Cause | Approximate interval: Onset to death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) → a. | Fentanyl and clonazepam toxicity | |
| Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST b. | Due to (or as a consequence of) | |
| c. | Due to (or as a consequence of) | |
| d. | Due to (or as a consequence of) | |

PART II. Other significant conditions contributing to death but not resulting in the underlying cause given in PART I.

24a. WAS AN AUTOPSY PERFORMED? ■ Yes ☐ No

24b. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? ■ Yes ☐ No

25. MANNER OF DEATH: ☐ Natural ☐ Homicide ■ Accident ☐ Pending ☐ Suicide ☐ Cannot be determined

26a. WAS CASE REFERRED TO MEDICAL EXAMINER? ■ Yes ☐ No

26b. IF YES ☐ Declined by Medical Examiner

27. TIME OF DEATH (Approximate): unknown

28. DID TOBACCO USE CONTRIBUTE TO DEATH? ☐ Yes ☐ Probably ☐ No ■ Unknown

29. IF FEMALE: ☐ Pregnant at time of death ☐ Not pregnant within past year ☐ Not pregnant, but pregnant within 42 days of death ☐ Not pregnant, but pregnant 43 days to 1 year before death ■ Unknown if pregnant within the past year

30. DATE PRONOUNCED (Month/Day/Year): 01/22/2018

31a. DATE OF INJURY (Month/Day/Year): 01/22/2018

31b. TIME OF INJURY: unknown

31c. INJURY AT WORK? ☐ Yes ■ No

31d. PLACE OF INJURY—at home, farm, street, factory, office, building, etc.: residence

31e. IF TRANSPORTATION INJURY SPECIFY: ☐ Driver/Operator ☐ Passenger ☐ Pedestrian Other (Specify) ______

31f. DESCRIBE HOW INJURY OCCURRED: used illicit drugs/prescription medications

31g. LOCATION OF INJURY (Street/Number/City/State): 4151 Aquadale Lane, Winston-Salem, NC

32. CERTIFIER (Check only one)
☐ Certifying physician/nurse practitioner/physician assistant – To the best of my knowledge, death occurred at the time, date, and place, and due to the cause(s) and manner stated.
■ Medical Examiner – On the basis of examination, and/or investigation, in my opinion death occurred at the time, date, and place, and due to the cause(s) and manner stated.

33a. SIGNATURE AND TITLE OF CERTIFIER: [signature], DO

33b. LICENSE NUMBER: 2014-02532

33c. DATE SIGNED (Month/Day/Year): 04/27/2018

33d. NAME AND ADDRESS OF CERTIFIER (Print legibly): Tiffany Erin O'Neill, DO, Wake Forest Baptist Medical Center, Winston Salem, NC

DHHS 2263 (REVISED 12/2013)
N.C. VITAL RECORDS (REVIEW 12/2016)

**North Carolina - Forsyth County**
**I hereby certify that this is a true and accurate copy of a record in the office of the Register of Deeds**

9 day of Jan, 2020.
**Lynne Johnson, Register of Deeds**

[signature]
**Deputy-Assistant**

REGISTER OF DEEDS FORSYTH CO. LYNNE JOHNSON OFFICIAL SEAL N.C.